

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NO. 1:24cr89 HSO-RPM |
| v. | |
| QUALITY POULTRY AND SEAFOOD, INC., | 18 U.S.C. § 371<br>21 U.S.C. § 331(k)<br>21 U.S.C. § 333(a)(2)<br>18 U.S.C. § 1343 |

**The United States Attorney charges:**

At all times relevant to the allegations of this Indictment:

### Defendants

1. Defendant **QUALITY POULTRY AND SEAFOOD** ("**QPS**") was a Mississippi corporation operating in Biloxi as a wholesale supplier of poultry and seafood to restaurants, casinos, and retail markets. It also sold poultry and seafood to the general public from its retail outlet and served meals to customers at its cafe.

2. Individual #1 was **QPS**'s Sales Manager, supervising the company's sales staff. He has been employed at **QPS** since 1993. Individual #1, the son of one of QPS's co-owners, was responsible for overseeing **QPS**'s sales to restaurants, casinos, and other wholesale customers both directly and through the **QPS** salesmen he managed.

3. Individual #2 became **QPS**'s Business Manager in 2014 after working at QPS for about six years. He was a certified public accountant and oversaw all of **QPS**'s businesses and its approximately thirty-five employees. In that position Individual #2 managed **QPS**'s purchases of seafood from its suppliers and monitored the prices that **QPS** charged its wholesale and retail customers.

1

4. Coconspirator #1 was a Mississippi corporation operating as a restaurant in Biloxi prominently advertising that it served local seafood to its customers.

5. Individual #3 was a co-owner of Coconspirator #1 and purchased fish and other food that the restaurant prepared and served to its customers.

## Applicable Laws

6. The Federal Food, Drug, and Cosmetic Act, Title 21 United States Code Sec. 301, et seq. regulates the production and marketing of food, drugs, and cosmetics transported and sold in interstate commerce. Title 21, United States Code, Section 331(k), prohibits the alteration, mutilation, destruction, obliteration, or removal of the whole or any part of the labeling of, or the doing of any other act with respect to, a food, drug, device, tobacco product, or cosmetic, if such act is done while such article is held for sale (whether or not the first sale) after shipment in interstate commerce and results in such article being adulterated or misbranded. A food is misbranded if its labeling and description is false and misleading in any particular and if it is offered for sale under the name of another food. Title 21, United States Code, Section 343(a) and (b).

7. It is a felony to misbrand a food and to violate any provision of Title 21, United States Code, Section 331, with the intent to defraud or mislead. Title 21, United States Code, Section 333(a)(2).

8. It is a felony for any person having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, to transmit or cause to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals,

pictures, or sounds for the purpose of executing such scheme or artifice. Title 18, United States Code, Section 1343.

## COUNT 1

### Conspiracy to Misbrand Seafood and to Use Interstate Wire Transmissions to Execute a Scheme to Defraud

9. At a time no later than 2015, and as early as 1999, and continuing through November 2019, defendant **QPS**, Coconspirator #1, and others, knowingly and willfully agreed and conspired to commit the following criminal offenses against the United States:

    a. With the intent to defraud and mislead consumers, the conspirators knowingly received fish that they held for sale after shipment in interstate commerce to facilitate its misbranding by offering it for sale under the name of another food, specifically, premium higher priced local fish species, in violation of Title 21, United States Code, Sections 331(k) and 333(a)(2).

    b. To advance their scheme to defraud, the conspirators knowingly transmitted and caused interstate wire transmissions of writings, signs, signals, and pictures to facilitate the sale of misbranded fish, in violation of Title 21, United States Code, Sections 331(k) and 333(a)(2), and in violation of Title 18, United States Code, Section 1343.

### The Purpose of the Conspiracy

10. It was the purpose of the conspirators and the objective of their conspiracy to benefit financially by misrepresenting and by facilitating the misrepresentation of the fish they and others sold as locally-sourced premium fish, when, as the conspirators well knew, they were not the local popular species advertised and identified on menus and for which customers were charged.

3

## Manner and Means of the Conspiracy

11. The following are among the means and methods employed by the defendant and its coconspirators to carry out the conspiracy and to achieve its unlawful objectives:

    a. Defendant **QPS**, Conspirator #1, and others, working as their employees and agents, purchased frozen seafood from foreign countries and from waters that were not the Mississippi Gulf, with the intent to advertise and sell them to **QPS** retail customers, Mississippi restaurants, and to the customers of Mississippi restaurants as local premium species when they were not local and not the species they were advertised to be. The conspirators thereby benefitted from the sale of seafood that would not have been as marketable or as profitable if its actual species and origin had been truthfully identified.

    b. Defendant **QPS** and others working as their employees and agents, recommended and sold to Conspirator #1, and others, inexpensive fish that, by taste and appearance, could be substituted for the premium local species advertised with little likelihood of detection. The conspirators thereby benefitted from the sale of seafood that would not have been as marketable or as profitable if its actual species and origin had been known.

    c. Conspirator #1, advertised Conspirator #1's menu of misbranded seafood on a publicly accessible website hosted on a server outside of Mississippi. To appeal to customers seeking local Gulf Coast seafood, the menu on their website and elsewhere stated, "all of our seafood is caught in our bountiful gulf waters"

    d. Coconspirators **QPS** and Conspirator #1 obtained payment, directly and indirectly, through interstate wire transmissions generated by credit card sales of their fraudulently misbranded seafood.

**Overt Acts in Furtherance of the Conspiracy**

12. In furtherance of this conspiracy and to achieve its objectives, at least one of the conspirators identified above, in the Southern District of Mississippi, committed at least one of the following overt acts:

*I. QPS's Sales to Restaurants of Fish Species Not Appearing on Their Menus*

(1) On January 26, 2015, Individual #2 sent the following text to Individual #1: "We need to raise the price of perch on [Conspirator #1's] perch we are getting 7%."

(2) In or around 2015 while standing inside Defendant **QPS's** large freezer containing boxes of imported frozen seafood, Individual #1 handed to Individual #3 packages of three different fish suggesting that Individual #3 sample each and decide which would best substitute for the local premium species on Conspirator #1's menu.

(3) On or about November 4, 2016, Defendant **QPS** sold Triggerfish to local Restaurant A for use as a substitute for premium local fish.

(4) In a text message dated July 5, 2017, Individual #1 of **QPS** wrote to Individual #3: "Still have no triple tail I'm sending you trigger-style fish 8 – 10 to use till we get it back in stock. [Employee of Restaurant A] is using it already instead of triple tail at the [Restaurant A] and said he has used it for grouper snapper and triple tail with no complaints. And it's cheaper than triple tail…." Individual #3 responded, "Ok".

(5) On or about July 25, 2017, Defendant **QPS** sold fish to a customer that **QPS** represented to be the local premium fish Red Snapper which was determined by genetic analysis not to be Red Snapper but was instead an imported species of lesser value.

(6) On or about September 29, 2017, Defendant **QPS** and Individual #1 sold Triggerfish to local Restaurant A for use as a substitute for premium local fish.

(7) In a January 19, 2018 email, a **QPS** seafood purchasing agent notified Individuals #1 and #2, and other **QPS** employees, "Due to the shortage on snapper we will be substituting triple tail for all snapper." Triple tail was not a local fish but was imported by **QPS** from Suriname in South America.

(8) In an April 16, 2018, email, Individual #2 sent the following instructions to Individual #1 and other members of the **QPS** sales staff: "I don't understand why we are giving Perch away [African Lake Victoria Perch "LVP"]. This is a replacement for the triple tail which were selling at $8.99 and $9.99. Now we are selling perch at $5.69 if we can't get at least $6.99 or $7.99 then it's not worth bringing it in here. This is a product that no one else has and it is versatile. Raise the price and make money where we can make money!"

(9) During the September 19, 2018, execution of a search warrant by the U.S. Food and Drug Administration ("FDA") at **QPS**, Individual #1 replied to Individual #3's text order for LVP, "Tomorrow[,] FDA here today." Individual #3 responded, "Ok."

### *II. Efforts to Conceal the Conspiracy: False Denials*

(10) When questioned by FDA agents during their September 19, 2018, search of **QPS**, Individual #2 falsely told the agents that if anyone in **QPS's** retail market was labeling a fish with a name other than its true name, it was done without his approval and without his knowledge.

(11) When questioned by federal agents during their September 19, 2018, search of QPS, Individual #2 told the agents that **QPS** does not ship any fish outside of the State of Mississippi.

6

(12) When questioned by federal agents during their September 19, 2018, search of **QPS**, Individual #2 told the agents that **QPS** had, in the past, sold fish to Conspirator #1's restaurant in Biloxi, Mississippi, but not much anymore.

(13) When questioned by federal agents during their September 19, 2018, search of **QPS**, Individual #2 falsely told the agents that he was not aware of any restaurant customer mislabeling and selling fish bought from **QPS** as something other than what it was, such as selling a cheap fish as an expensive one.

(14) When questioned by federal agents during their September 19, 2018, search of **QPS**, Individual #1 falsely told the agents that any mislabeling of fish by **QPS** was inadvertent and he did not know of any mislabeling of fish by the restaurants to which **QPS** sold seafood.

### *III. QPS's Seafood Sales to Coconspirator #1 During and After the September 19, 2018, Federal Search at QPS*

(15) On September 19, 2018, while an authorized federal search of **QPS** was underway, Individual #3 sent an electronic text message to Individual #1 ordering LVP, which his restaurant, Conspirator #1, regularly mislabeled and sold to customers as local Mississippi Gulf Coast Snapper.

(16) Eight days after FDA's search of **QPS**, in a September 27, 2018, text to Individual #1, Individual #3 ordered 150 pounds of LVP in order to sell it to customers of Conspirator #1's restaurant as Snapper.

(17) About a month after FDA's search of Defendant **QPS**, in an October 18, 2018, text to Individual #1, Individual #3 ordered 60 pounds of LVP for sale by Conspirator #1's restaurant as Snapper.

(18) In an October 18, 2018, text, after Individual #1 informed him that **QPS** was unlikely to obtain more LVP, "Perch about to be nonexistant," Individual #3 instructed him to "Get all they have."

(19) In a February 21, 2019, text, Individual #1 told to Individual #3, "We have 110 cases of perch left when that is gone there is no more. FYI we are looking for alternatives. Unicorn, triple tail and parrot fish are always good alternatives."

(20) In a responsive February 21, 2019, text, Individual #3 told Individual #1, not to sell the remaining cases of LVP to any other customers, "I will buy them." Individual #1 responded, "You come bring me a check and I will set it aside for you."

### *IV. Additional 2019 QPS Sales to Conspirator #1 Of Fish Misbranded on Conspirator #1's Menu*

Fish not delivered when sold was held by **QPS** for delivery at Conspirator #1's Request

The Overt Acts below are the individual deliveries by **QPS** and Individual #1 to Conspirator #1 of fish species not identified on Conspirator #1's Menu

| Overt Act | Date | Invoice # | Fish Sold as a Premium Local Species | Pounds Sold | Pounds Delivered | Price per Pound | Total |
|---|---|---|---|---|---|---|---|
| 21 | 01/07/19 | 01-305315 | Lake Perch - Africa | 120 | 120 | $5.95 | $714.00 |
| 22 | 01/11/19 | 01-305620 | Lake Perch - Africa | 80 | 80 | $5.95 | $476.00 |
| 23 | 01/15/19 | 01-305792 | Lake Perch - Africa | 100 | 100 | $5.95 | $595.00 |
| 24 | 01/21/19 | 01-306128 | Lake Perch - Africa | 60 | 60 | $5.95 | $357.00 |
| 25 | 01/25/19 | 01-306393 | Lake Perch - Africa | 100 | 100 | $5.95 | $595.00 |
| 26 | 01/31/19 | 01-306697 | Lake Perch - Africa | 80 | 80 | $5.95 | $476.00 |
| 27 | 02/05/19 | 01-306984 | Lake Perch - Africa | 120 | 120 | $5.95 | $714.00 |
| 28 | 02/08/19 | 01-307209 | Lake Perch - Africa | 60 | 60 | $5.95 | $357.00 |
| 29 | 02/13/19 | 01-307475 | Lake Perch - Africa | 200 | 200 | $5.95 | $1,190.00 |
| 30 | 02/20/19 | 01-307927 | Lake Perch - Africa | 140 | 140 | $5.95 | $833.00 |

| Overt Act | Date | Invoice # | Fish Sold as a Premium Local Species | Pounds Sold | Pounds Delivered | Price per Pound | Total |
|---|---|---|---|---|---|---|---|
| 31 | 02/21/19 | 01-307993 | Lake Perch - Africa | 1,080 | | $5.95 | $6,426.00 |
| 32 | 02/26/19 | 01-308276 | Lake Perch - Africa | | 100 | | |
| 33 | 03/04/19 | 01-308678 | Lake Perch - Africa | | 100 | | |
| 34 | 03/07/19 | 01-308827 | Lake Perch - Africa | | 80 | | |
| 35 | 03/13/19 | 01-309236 | Lake Perch- Africa | | 100 | | |
| 36 | 03/16/19 | 01-309509 | Lake Perch - Africa | | 100 | | |
| 37 | 03/19/19 | 01-309645 | Triple Tail - Suriname | 2,000 | | $7.99 | $15,980.00 |
| 38 | 03/20/19 | 01-309694 | Lake Perch - Africa | | 60 | | |
| 39 | 03/22/19 | 01-309903 | Lake Perch - Africa | | 100 | | |
| 40 | 03/27/19 | 01-310191 | Lake Perch - Africa | | 200 | | |
| 41 | 04/01/19 | 01-310525 | Lake Perch - Africa | | 100 | | |
| 42 | 04/05/19 | 01-310837 | Lake Perch - Africa | | 100 | | |
| 43 | 04/10/19 | 01-311145 | Lake Perch - Africa | | 100 | | |
| 44 | 04/15/19 | 01-311451 | Triple Tail - Suriname | | 100 | | |
| 45 | 04/18/19 | 01-311707 | Triple Tail - Suriname | | 100 | | |
| 46 | 04/25/19 | 01-312136 | Triple Tail - Suriname | | 100 | | |
| 47 | 05/02/19 | 01-312640 | Triple Tail - Suriname | | 50 | | |
| 48 | 05/07/19 | 01-312938 | Triple Tail - Suriname | | 100 | | |
| 49 | 05/10/19 | 01-313166 | Triple Tail - Suriname | | 50 | | |
| 50 | 05/15/19 | 01-313455 | Triple Tail - Suriname | | 100 | | |
| 51 | 05/20/19 | 01-313783 | Triple Tail - Suriname | | 100 | | |
| 52 | 05/28/19 | 01-314272 | Triple Tail - Suriname | | 100 | | |
| 53 | 06/03/19 | 01-314630 | Triple Tail - Suriname | | 100 | | |
| 54 | 06/05/19 | 01-314769 | Triple Tail - Suriname | | 100 | | |
| 55 | 06/10/19 | 01-315053 | Triple Tail - Suriname | | 100 | | |
| 56 | 06/11/19 | 01-315150 | Triple Tail - Suriname | | 100 | | |
| 57 | 06/12/19 | 01-315209 | Triple Tail - Suriname | | 100 | | |

| Overt Act | Date | Invoice # | Fish Sold as a Premium Local Species | Pounds Sold | Pounds Delivered | Price per Pound | Total |
|---|---|---|---|---|---|---|---|
| 58 | 06/18/19 | 01-315583 | Triple Tail - Suriname |  | 100 |  |  |
| 59 | 06/20/19 | 01-315747 | Triple Tail - Suriname |  | 100 |  |  |
| 60 | 06/20/19 | 01-315748 | Triple Tail - Suriname | 500 |  | $8.29 | $4,145.00 |
| 61 | 06/24/19 | 01-315963 | Triple Tail- Suriname |  | 100 |  |  |
| 62 | 06/28/19 | 01-316279 | Triple Tail - Suriname |  | 100 |  |  |
| 63 | 07/02/19 | 01-316459 | Triple Tail - Suriname |  | 100 |  |  |
| 64 | 07/09/19 | 01-316811 | Triple Tail - Suriname |  | 100 |  |  |
| 65 | 07/15/19 | 01-317168 | Triple Tail - Suriname |  | 100 |  |  |
| 66 | 07/18/19 | 01-317377 | Triple Tail - Suriname |  | 100 |  |  |
| 67 | 07/22/19 | 01-317556 | Triple Tail - Suriname |  | 100 |  |  |
| 68 | 07/26/19 | 01-317857 | Triple Tail - Suriname |  | 100 |  |  |
| 69 | 07/30/19 | 01-318016 | Triple Tail - Suriname |  | 100 |  |  |
| 70 | 08/05/19 | 01-318333 | Triple Tail - Suriname |  | 100 |  |  |
| 71 | 08/08/19 | 01-318527 | Triple Tail - Suriname |  | 60 |  |  |
| 72 | 08/13/19 | 01-318773 | Unicorn-India | 150 | 150 | $7.99 | $1,198.50 |
| 73 | 08/15/19 | 01-318913 | Unicorn-India | 50 | 50 | $7.99 | $399.50 |
| 74 | 08/22/19 | 01-319526 | Unicorn-India | 100 | 100 | $7.99 | $799.00 |
| 75 | 08/23/19 | 01-319385 | Unicorn-India | 50 | 50 | $6.99 | $349.50 |
| 76 | 08/27/19 | 01-319547 | Unicorn-India | 100 | 100 | $6.99 | $699.00 |
| 77 | 09/03/19 | 01-319898 | Unicorn-India | 100 | 100 | $6.99 | $699.00 |
| 77 | 09/06/19 | 01-320138 | Unicorn-India | 100 | 100 | $6.99 | $699.00 |
| 79 | 09/16/19 | 01-320622 | Triple Tail- Suriname | 100 | 100 | $8.95 | $895.00 |
| 80 | 09/19/19 | 01-320845 | Triple Tail - Suriname | 100 | 100 | $8.95 | $895.00 |
| 81 | 09/24/19 | 01-321115 | Triple Tail - Suriname | 100 | 100 | $8.95 | $895.00 |
| 82 | 09/27/19 | 01-321304 | Triple Tail - Suriname | 100 | 100 | $8.95 | $895.00 |
| 83 | 10/04/19 | 01-321715 | Triple Tail - Suriname | 100 | 100 | $8.95 | $895.00 |
| 84 | 10/08/19 | 01-321890 | Triple Tail - Suriname | 50 | 100 | $8.95 | $447.50 |

| Overt Act | Date | Invoice # | Fish Sold as a Premium Local Species | Pounds Sold | Pounds Delivered | Price per Pound | Total |
|---|---|---|---|---|---|---|---|
| 85 | 10/11/19 | 01-322091 | Triple Tail - Suriname | 100 | 100 | $8.95 | $895.00 |
| 86 | 10/16/19 | 01-322337 | Triple Tail - Suriname | 50 | 100 | $8.95 | $447.50 |
| 87 | 10/24/19 | 01-322810 | Triple Tail - Suriname | 50 | 100 | $8.95 | $447.50 |
| 88 | 10/23/19 | 01-322721 | Triple Tail - Suriname | 100 | 100 | $8.95 | $895.00 |
| 89 | 10/29/19 | 01-323056 | Triple Tail - Suriname | 60 | 100 | $8.95 | $537.00 |
| 90 | 10/31/19 | 01-323175 | Triple Tail - Suriname | 100 | 100 | $8.95 | $895.00 |
| 91 | 11/07/19 | 01-323565 | Triple Tail - Suriname | 60 | 100 | $8.95 | $537.00 |
| 92 | 11/12/19 | 01-323832 | Triple Tail - Suriname | 60 | 100 | $8.95 | $537.00 |
| 93 | 11/15/19 | 01-324064 | Triple Tail - Suriname | 100 | 100 | $8.95 | $895.00 |

***V. Sales Facilitated by Interstate Wire Transmissions***

(94) Between May 26, 2019, and August 16, 2019, Conspirator #1 posted its menu on the publicly-accessible website www.marymahoney.com, which was hosted outside of Mississippi, advertising the sale of premium local species for which Defendant **QPS**, Conspirator #1, Individual #3, and Individual #1, and Individual #2, substituted imported frozen fish of lesser value.

(95) On or about August 16, 2019, Conspirator #1 processed a credit card transaction causing an interstate wire transmission. The transaction was for payment of seafood purchased by a customer from Conspirator #1. Defendant **QPS**, Individual #1, and Individual #2, supplied the misbranded seafood that Conspirator #1 sold to their customer, falsely representing it to be the local premium species, Snapper.

### *VI. Summary of QPS's Sales of Fish to Conspirator #1 for Misbranding and Sale*

13. Between December 2013 and November 2019, the defendant **QPS** and other conspirators, with the intent to defraud and mislead consumers, knowingly and willfully arranged for Defendant **QPS** to supply to Conspirator #1, approximately 58,750 pounds (over 29 tons) of imported Lake Victoria Perch, Trigger Fish, Triple Tail, and Unicorn Filefish for sale under the names of other more popular species. The accurate species names did not appear on Conspirator #1's menu nor on its website and instead were fraudulently sold to its customers under the names and at the higher prices of local premium fish.

All in violation of Title 18, United States Code, Section 371.

### **NOTICE OF INTENT TO SEEK CRIMINAL FORFEITURE**

14. As a result of committing the offenses as alleged in this Indictment, the defendant shall forfeit to the United States all property involved in or traceable to property involved in the offenses, including but not limited to all proceeds obtained directly or indirectly from the offenses, and all property used to facilitate the offenses. Further, if any property described above, as a result of any act or omission of the defendant: (a) cannot be located upon the exercise of due diligence; (b) has been transferred or sold to, or deposited with, a third party; (c) has been placed beyond the jurisdiction of the Court; (d) has been substantially diminished in value; or (e) has been commingled with other property, which cannot be divided without difficulty, then it is the intent of the United States to seek a judgment of forfeiture of any other property of the defendant, up to the value of the property described in this notice or any bill of particulars supporting it.

All pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(1); and Title 28, United States Code, Section 2461.

*[signature: Ari O. Chalk]*
for TODD W. GEE
United States Attorney

*[signature: Jeremy F. Kengenik for, by A. Jones AUSA]*
TODD KIM
Assistant Attorney General
Environment & Natural Resources Division